**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**AT LOUISVILLE**

UNITED STATES OF AMERICA                                            PLAINTIFF

v.                                            CRIMINAL ACTION NO. 3:09-CR-7-S

BRANDON W. DUFFY                                                      DEFENDANT

## REPORT AND RECOMMENDATION

The defendant, Brandon W. Duffy, moves to suppress statements he made, absent a

*Miranda* warning, to Wal-Mart security personnel on May 2, 2008, and to suppress the product

of these initial statements, including later statements to police and material later seized in a

search of his computer.[1]  The court referred this matter to the United States Magistrate Judge

James D. Moyer for proposed findings of fact, conclusions of law and recommendations,

pursuant to 28 U.S.C. § 636(b)(1)(A) and (B).  The magistrate judge presided over an

evidentiary hearing and requested additional briefing from the parties.  Following a review of

each witness's testimony and argument of counsel, the magistrate judge concludes no Fourth or

Fifth Amendment violation or *Miranda* violation occurred because no credible evidence supports

a finding that Wal-Mart acted as an agent of the police.  The magistrate judge will therefore

recommend denying the motion to suppress.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966).

# I. FINDINGS OF FACT

1)   Officers of the Louisville Metro Police Department arrested Brandon Duffy at a Wal-Mart store in Fern Creek, Kentucky on May 2, 2008, and executed a search warrant of his residence and computer on the same day.  In a videotaped statement following his arrest, Duffy signed a *Miranda* waiver and then admitted to videotaping male children in the men's room at Wal-Mart while they urinated.  Duffy also admitted to the same conduct at a little league baseball field.  Duffy faces federal charges for both production and receipt of child pornography.[2]

2)   Duffy's arrest was the culmination of investigative efforts on the part of both Wal-Mart security personnel and the police department.  Before his arrest, Duffy sat for an interrogation conducted by Wal-Mart after a confrontation in the store and proceeded to incriminate himself and to provide Wal-Mart with a written statement.  One factual issue presented here concerns the level of cooperation between Wal-Mart and law enforcement.  Did Wal-Mart conduct its investigation at the behest or direction of police or under sufficient police coordination such that Wal-Mart employees were a mere proxy for police detectives?  The police, unlike Wal-Mart security, may obtain only uncoerced, *Mirandized* statements and must investigate under the constitutional restraints against unreasonable searches and seizures.

**The Initial Stages of the Investigation**

3)   Wal-Mart's investigation began when a customer complained that on April 15, 2008 in the Fern Creek store, a man tried to take a picture of her son (a juvenile) in the men's room.  The

---

[2]United States Exhibits 22, 24, 25.

customer spoke on the phone with Robert Mangold, Wal-Mart Asset Protection Manager for the Louisville market, which contains twelve stores. Mangold testified he received the call a few days after the 15th and immediately traveled to the store to check surveillance video, a task handled by Valrie Dorsey, Asset Protection Coordinator at Fern Creek. Dorsey testified that surveillance video revealed a man who sat outside the restrooms located in the front of the store and who twice followed young boys inside the men's room.[3]

4) With this information in hand, Mangold reported the incident to the police. A patrolman came to the store and prepared an initial report. From that point forward, according to Mangold, Dorsey became the point person for police contact and kept Mangold informed of any developments.[4] Mangold conceded, however, that he spoke with Detective Arterburn several times over the course of the investigation.[5]

5) Dorsey prepared a written report, referred to as a time-line, which provides a description of events captured on the video.[6] Mangold was present while Dorsey prepared the time-line. Dorsey further testified she personally called police and reported the incident to Detective Arterburn.[7]

---

[3]Mangold testified he received the customer complaint around the 17th or 18th of April, the same day he and Dorsey together reviewed the surveillance video. Mangold was probably mistaken about this date. Dorsey stated she first became aware of the customer complaint around April 21st when Mangold, who attended the same church as the customer, gave Dorsey a picture of the boy and the date of the incident. With this information, Dorsey stated, she easily identified video of the boy entering the men's room followed by a male subject who had been seated near the restroom entrances. Dorsey added that the complaint was that the boy noticed a camera under the wall separating his from the adjacent stall. (TR 105-108.) Sergeant Thornsberry testified he received the initial call from Wal-Mart on or about April 21st and immediately assigned the matter to Detective Arterburn. (TR 168-69.)

[4]TR 18-20, 57-58.

[5]TR 57.

[6]TR 86-87, 139, 108. Exhibit 21 is dated by the date of the incident, April 15th.

[7]TR 111.

6) On or about April 25th, Detective Arterburn met with Dorsey at the Fern Creek store. Dorsey stated he may have asked her to look other incidents captured on video, to find out whether anyone recognized the subject, and to call the police if the subject returned to the store.[8] In fact, Dorsey found more video of the subject and determined he was coming to the store on a regular basis. Dorsey provided this information to Detective Arterburn, but it is not clear when.[9]

7) Viewed superficially, Dorsey's testimony might create an impression that Detective Arterburn could have directed her investigative efforts. Under further examination, however, Dorsey described her investigation as routine and explained that in every investigation, she would search at least 30 days for additional information, copy pertinent video, and provide it to the authorities.[10] The overall impression of the court is that her investigation was independent, self-directed, although she did communicate information to law enforcement and did discuss the case with them.

8) Dorsey also identified the subject's vehicle (but not the licence plate number), when by chance she walked past him as he was exiting the store.[11] On another occasion, Dorsey returned to the store from lunch and saw the subject again seated on the bench near the front restrooms. She immediately informed the store manager, Bobby Orr, called the police, and also left a message for Detective Arterburn.[12] Dorsey and Orr waited at the storefront and considered whether they should stop the subject; they decided to wait for law enforcement, but the subject

---

[8]TR 111, 201.

[9]TR 112-113, 141-143.

[10]TR 161.

[11]TR 114, 144-145.

[12]TR 76, 112, 114.

left before the authorities arrived.[13]  She did not recall whether an officer in uniform or a detective came on this date.[14]  On this occasion, Dorsey was able to see the license plate number of the subject's vehicle and report it to Detective Arterburn by phone.[15]  These events preceded a second meeting between Dorsey and Detective Arterburn.[16]

**The License Plate Search and Photo Lineup**

9)    Detective Arterburn learned the license plate number – provided to him by Dorsey – was registered to a man at an address in nearby Mt. Washington, Kentucky.  But, this person's description did not match the suspect on the surveillance video.  Detective Arterburn then learned the vehicle owner had a son, named Brandon Duffy, whose photo (obtained from the Kentucky State Police) matched the subject in the surveillance video.  With this information, Detective Arterburn prepared a photo lineup.[17]

10)    The defense emphasized the fact that Mangold knew the license plate was registered to a Mt. Washington address.[18]  Typically, the police will only confirm the plate number provided is a valid plate number and will not release information about a license plate check to

---

[13]TR 113; "Bob" refers to Mangold; "Bobby" refers to Orr.

[14]TR 115-116, 119.

[15]TR 145.

[16]TR 212.  Detective Arterburn went to the store to show a photo array and to pick up a second set of video showing the vehicle tag.

[17]207-209.

[18]TR 81.

the public.[19]  Mangold denied police informed him of the actual search results, and when challenged how he knew more, Mangold testified Dorsey may have learned it from the police and then told him.[20]  However, Dorsey testified she had no knowledge of the results.[21]

11)   Detective Arterburn came to the store on May 1, 2008, and asked Dorsey (not Mangold) to review the photo lineup.  The meeting occurred in Dorsey's office.  Dorsey told the detective about another Wal-Mart employee who had noticed the subject's behavior.  At the detective's request, Dorsey asked the employee to join them in her office and to look at the photo array.[22]  The employee identified the subject.[23]

12)   Dorsey was present when Detective Arterburn showed the photo array to the other Wal-Mart employee, a fact the defense emphasized as being an "unusual" level of cooperation.[24]  When the defense pressed Dorsey further about this cooperation, Dorsey denied she received specific instructions.

> Q. Okay.  And what were the instructions you received as to what to do next time?
> A. I don't remember exact instructions, but I know if any incident came up, to call the police.
> Q. Okay.
> A. Even – Mr. Mangold even told me that if anything goes on, make sure I inform police officers and call him, because anything like that goes on in the store, we have to call him to let him know what's going on.
> Q. Well, what did Detective Arterburn say you should do?
> A. Just inform the police.

---

[19]TR 179.

[20]TR 79.

[21]TR 148.

[22]TR 157.

[23]TR 114, 146, 149, 204. Apparently, Dorsey also identified the subject in the photo array.

[24]TR 179-182.

Q.  Okay.  And –

A.  Call him or either – call him or call the police if anything happens.

Q.  And what should be done with Mr. Duffy?

A.  He didn't – we didn't discuss that.[25]


**The BOLO**

13)     Another suggestion of unusual cooperation, in the defense's view, concerns the

public dissemination of an internal, police e-mail, referred to as a "Be On the Lookout Order"

(BOLO), of the incident under investigation at Wal-Mart.[26]

14)     Detective Arterburn authored the BOLO in which he advised that a suspect was

waiting for children to enter the men's restroom on weekdays between the hours of 15:15 and

16:30.  The BOLO stated that if the "suspect is stopped, please take his phone, and possibly

laptop, to preserve evidence."[27]  The BOLO further states, "In order to make the charge of child

pornography or video voyeurism, we will need a search warrant or consent to view his phone

and the photos must show genitalia.  It is likely he is uploading them to a computer ... ."[28] These

comments presaged in some respects the manner in which Wal-Mart handled its interrogation of

the defendant.

15)     However, rather than establish the defense theory that police sent the BOLO to Wal-

Mart, evidencing its highly cooperative, if not compliant, role in the police investigation, the

testimony bore out a very different scenario.  Mangold testified he received the BOLO in an e-

---

[25]TR  149-150.

[26]Defense Exhibit 2; TR 93, 171.  The BOLO does not name the subject but shows images captured by surveillance video of the subject entering the store and the subject's vehicle.

[27]TR 62.

[28]TR 66-67.

mail (to his home e-mail account) from a parent of his son's schoolmate. He did not receive the BOLO from the police.[29] Mangold received the BOLO sometime before the day the defendant was confronted and interrogated at Wal-Mart. After he received the BOLO, Mangold called Sergeant Thornsberry with concern that the document was released to the general public. Mangold explained that he worried it could compromise the investigation and that "it didn't look good for Wal-Mart."[30] In brief, the BOLO was potentially embarrassing to Wal-Mart.

16)     Sergeant Thornsberry, who oversees eleven detectives in the Crimes Against Children Unit, testified it is not common practice to circulate a BOLO outside the police department; however, an officer in another division acted on his own and e-mailed the BOLO to his contacts throughout the community.[31] Sergeant Thornsberry stated he received an angry call from Mangold because the e-mail placed Wal-Mart in a negative light.[32] Sergeant Thornsberry apologized.[33] In these conversations with Mangold, the sergeant provided no instruction to Wal-Mart in the handling of its investigation.[34]

17)     In turn, Mangold testified that the BOLO did not influence how he conducted his investigation, and particularly the interrogation of the subject.[35] Both Dorsey and Orr testified

---

[29]TR 61, 64.

[30]TR 76.

[31]TR 172.

[32]TR 173-174.

[33]TR 179.

[34]TR 174.

[35]TR 93.

they had never seen the BOLO prior to the suppression hearing.[36]


**The Customer Confrontation, Wal-Mart Interrogation, and Arrest**

18)     On Friday, May 2, 2008, Mangold was at home when he received a call from the store manager, Bobby Orr, who told him the subject they suspected of watching children and taking photos was in the building.[37]  On his drive to the store (less than 10 minutes), Mangold called Sergeant Thornsberry and placed another call to Detective Arterburn.[38]  Mangold asked them to send a car.[39]  Mangold denied the detectives provided him with any particulars or direction in how to proceed.[40]  Mangold then received another call from store manager Orr, who said the subject tried to go into the men's room but was confronted by two hostile women saying, essentially,  "You're not going in after a kid."[41]  Mangold told Orr, "Just stay where you are.  Just keep everything as calm as you can."[42]

19)     Dorsey was returning from lunch when she saw the scene at the front restrooms.  She observed Wal-Mart employees trying to calm everyone down and keeping other customers at bay, because so many people were crowding the scene.[43]  Dorsey testified Mangold arrived at the

[36]TR 158, TR2 32.

[37]TR 22.

[38]TR 55.

[39]TR 57, 72-73.

[40]TR 24.

[41]TR 22, 24.

[42]TR 23.

[43]TR2 31.  Orr testified to the crowd of Wal-Mart employees and customers captured on surveillance video.

same time, immediately approached the subject, and said, "You need to come with us."[44] According to Dorsey, the subject asked who they were, and Mangold replied, "We're the people that's (sic) going to save your life right now," because, as Dorsey explained, it was "starting to get really bad."[45] Dorsey testified that "the women were hollering" and that the subject "looked kind of nervous and scared."[46]

20)     The store manager, Bobby Orr, also described the scene while waiting for Mangold to arrive. The surveillance video replayed during his testimony captures much of the chaotic scene, although without audio, and in particular shows one of the "hostile" women who appears visibly confrontational. For the duration of the scene outside the men's room, she holds an aggressive, agitated stance vis-a-vis the defendant.[47] Orr testified that in his call to Mangold he explained the situation and Mangold assured Orr he was on his way. The defense failed to establish that Mangold directed Orr to take the subject's cell phone, as had been suggested by the police BOLO.[48] Under cross-examination, Orr testified that Mangold did not say, "Hold him here" or instruct him in how to handle the situation.[49] Orr said he did not have "any preconceived notion" after speaking with Mangold and that "as a member of management, when you walk across your store and you see ... three or four people screaming, the first thing that you do is contain the

---

[44]TR 122-124, 164.

[45]TR 124-125.

[46]TR 129.

[47]TR2 17.

[48]TR2 55.

[49]TR2 54-55.

situation."[50]

21)     As Mangold described it, the two women and the subject were receiving "a lot of attention" from bystanders.[51]  Mangold testified that without introducing himself to the subject, he said, "You need to come with me."  The subject replied, "Where are we going?" and Mangold said, "We can stay here or go to the back and get away from this."  The subject said, "No, I'll come with you."[52]  Mangold was wearing shorts and a tee-shirt.  Dorsey was wearing casual work clothes and a Wal-Mart name badge.

22)     Mangold led the subject to the rear of the store.  During the walk, Mangold touched the subject's elbow once, in a leading fashion.[53]  The subject followed Mangold, without resistance, to a conference room and asked who Mangold was.  He replied, "My name is Bob Mangold.  I do investigations for Wal-Mart."[54]  After taking a seat, the subject said, "I don't even know what's going on."  Mangold began, "Let me tell you what's happening; back several weeks ago, we got this report and we did an investigation ... ."[55]  Duffy remained in the conference room for a total of an hour to an hour and a half.[56]

23)     The conference room is windowless and has one door, and Mangold seated himself

---

[50]TR2 55.

[51]TR 31.

[52]TR 33.

[53]TR (Vol. 2) 47.

[54]TR 32.

[55]TR 34.

[56]TR 40.

-11-

between the door and Duffy. Dorsey was seated next to Mangold, across from Duffy.[57] Later, Orr took Dorsey's place. At the outset, Mangold asked the subject for his driver's license, and in due course his camera and cell phone.[58] The camera and cell phone were placed on the conference table.[59] Duffy's wallet remained on the table, although Mangold held the license and at some point made a copy.[60] Mangold explained that he asked for the cell phone because most are equipped with a camera and that if he had access to it, Duffy could destroy evidence while he was sitting there.[61]

24)     Mangold told Duffy that he worked for Wal-Mart and specifically told him he was not a police officer; he repeated the same for Dorsey.[62] Mangold told Duffy they had surveillance video and that what he was doing was wrong and needed to stop.[63] Mangold continued that "you need help, and the best way to get help is admit you've got a problem and talk about it."[64] Duffy admitted to taking pictures and video of boys in the restroom.[65]

25)     Mangold testified that Duffy, at first, seemed very relieved to have escaped the chaotic scene at the restrooms. His demeanor was "a little odd," "just real subdued," "like a beat

----

[57]TR 153.

[58]TR 49, 71.

[59]TR 153-154.

[60]TR 71.

[61]TR 50, 62.

[62]TR 34.

[63]TR 36.

[64]TR 37.

[65]TR 37.

pup," "pretty calm, I think embarrassed."[66] Duffy was not at all combative but remained

compliant the whole time.[67] Duffy never asked to leave, nor was he told he must stay; Duffy did

not ask to call anyone, and declined to answer his cell phone when it rang during the

interrogation.[68] Mangold testified that Duffy's demeanor or willingness to talk to him did not

change when Mangold told him the police were on their way.[69] At no point during the

interrogation did Duffy indicate a desire to leave. No Wal-Mart employee physically restrained

Duffy's movement at any time, nor is there any suggestion that they blocked the exit from the

conference room.

26)   According to Mangold, Dorsey was silent but somewhat emotional toward Duffy and

soon became a distraction to the interview process. Duffy asked why she was glaring at him and

asked if she needed to be there.[70] Mangold agreed and Bobby Orr took her place.[71] When asked

to describe the interrogation, Dorsey used the phrase "laid back." Dorsey continued, "Before I

was asked to leave ... it was like he was just talking to a normal – like [it] wasn't anything – I

was a little heated, but he was – Mr. Mangold was calm and talking to him like, 'How you

doing?' and ... just talking to him like he was having normal conversation with someone."[72]

27)   The following colloquy is an example of how Dorsey testified convincingly under

---

[66]TR 41.

[67]TR 45.

[68]TR 40-41, 49, 95.

[69]TR 43.

[70]TR 152.

[71]TR 35.

[72]TR 151-152.

cross-examination:

> Q. All right.  Now, in this 15 to 20 minutes that you're there –
> A. Yes, sir.
> Q. – you've said Mr. Mangold talked about how Mr. Duffy might need some help?
> A. No. I didn't say that.  I just said he said, "Some" – "Sometimes people do stuff, and they make bad decisions."  He – he was – asked him about people that make bad decision and that it's not – don't mean they're a bad person.  They just made bad decisions, which is – he was talking to him like – saying stuff like that, which at that time, he was doing most of the talking.
> Q. All right.
> A. Mr. Duffy was just shaking his head or just sitting there.[73]

28)     When the defense challenged Dorsey's testimony about Duffy's cooperative

demeanor, Dorsey testified:

> Q. And he what?
> A. He handed Bob, Mr. Mangold, the cell phone.
> Q. So, he handed it to him?
> A. Yes, sir.
> Q. And he handed him the camera?
> A. Yes, sir.
> Q. Because Mr. Mangold directed him to?
> A. He didn't direct him.  He asked him, did he have one, and he said, "Yes."  And he handed it to – and he gave it to him.[74]

29)     At a point in the interview after Orr had replaced Dorsey, Mangold looked at the

camera, observed the memory card was missing, and asked Duffy where it was.  Duffy said that

he had run back into the men's room and flushed the video card down the toilet in the first stall.[75]

Apparently, during the confrontation with the two women, while Orr stood by waiting for

Mangold to arrive, Duffy asked to use the restroom and, although followed by Orr inside, was

---

[73]TR 153-154.

[74]TR 155-156.

[75]TR 39-40, 68-69.

-14-

given privacy in the first stall where he flushed the video card.[76]  Despite one of the women's warning that Duffy would "dump the media card," Orr did not restrain Duffy's movement.[77]

30)     Once satisfied with the interview, Mangold proceeded to give Duffy a pen and paper and asked him to write a statement.  Following Wal-Mart procedure, Mangold left Duffy alone in the room and returned after Duffy let him know he had finished the statement by opening the conference room door.[78]

31)     Detective Jackman arrived at the store and was led off the sales floor to the rear hallway outside the conference room.[79]  He simply waited there until Detective Arterburn arrived, approximately ten to fifteen minutes later.  Detective Arterburn formally arrested Duffy, and Detective Jackman helped escort Duffy out the store's rear entrance to a police vehicle.  At the police station, Duffy gave a video-taped statement.  Detective Jackman remained at the store while a plumber attempted, but was unable, to retrieve the flushed memory card.[80]


**Wal-Mart Security Custom or Practice**

32)     Dorsey maintained that this interrogation was handled consistently with how Wal-Mart would investigate criminal activity:  the subject is taken to a "private area," either the conference room or an office, where security personnel question them and then call authorities.[81]

---

[76]TR 15 (Vol. 2).

[77]TR (Vol. 2) 26.

[78]TR 38, 72;  At the request of the arresting officers, Mangold wrote a statement, (Defense Ex. 3).

[79]TR 43, 188.

[80]TR 188, 190-192.

[81]TR 162-163.

Dorsey testified that if she had arrived before Mangold, she would have escorted the subject away from customers and proceeded in the same manner. She stated that Mangold was acting in the way "we normally do."[82]

33) Dorsey conceded that Wal-Mart and the police were working together to solve the case, that they were "working in concert" in the investigation.[83] In context, Dorsey's concession accurately characterizes her experience: she gave Detective Arterburn the time-line, the pictures (surveillance tape) and copies of the Wal-Mart file. "Everything I had, I gave him a copy of everything" because, she agreed, Wal-Mart and police were "working together" to solve the case.[84]

34) Mangold testified that part of his responsibility as asset protection manager was to prevent the unknown loss of merchandise. His responsibilities also included premises security, safety, and risk management. Wal-Mart has a specific policy in dealing with shoplifters but none dealing specifically with the kind of occurrence of April 15th. In the event of a suspicion or report of any criminal activity in the store, usually a purse snatching, Wal-Mart begins its own investigation first by finding the occurrence on video and then identifying a suspect and gathering as much information as possible. For internal thefts, Wal-Mart's usual investigation will proceed with an interview of the associate for the purpose of obtaining admissions as well as recovering the loss. Mangold received training in interrogation and had been conducting such interviews for 19 years. If the victim is a customer, Wal-Mart policy takes the additional step of

---

[82]TR 165.

[83]TR 140.

[84]TR 138-139.

contacting the police to report a crime.  Mangold testified that when Wal-Mart is not the victim,

his responsibility is to support customers by providing a safe shopping environment.[85]

**Suppression Hearing and Pending Motions**

35)     On June 9 and June 24, 2009,  the Magistrate Judge presided over an evidentiary

hearing on the defendant's motion to suppress.  The defendant seeks to suppress statements he

gave during the Wal-Mart interrogation and to exclude all evidence derived from those

statements, including the post-arrest, post-*Miranda* statements he made to Detective Arterburn

and the materials seized from his home computer.

36)     In recent days, the defense has moved to stay the ruling on the motion to suppress and

has moved for further disclosure of a disciplinary action, which the United States has advised

occurred in 2004 against Detective Arterburn for a charge of untruthfulness in an unrelated case.

Detective Arterburn testified at the suppression hearing but his testimony is not included in these

findings, except to pinpoint the date the detective showed the photo array to Dorsey and another

Wal-Mart employee.  His credibility – or any arguable lack of credibility – is not in any way

material to the court's analysis of the suppression motion.

---

[85]TR 12-18.

## II. CONCLUSIONS OF LAW

37)     By the time police arrived at Wal-Mart and arrested Duffy on May 2, 2009, Duffy

had given Wal-Mart security a written statement and incriminated himself.  These statements are

inadmissible, the defense contends, because Mangold, the Wal-Mart security manager, was

acting as an agent of the police, under this judicial circuit's agency test in a search and seizure

case, *United States v. Hardin*, 529 F.3d 404, 418 (6th Cir. 2008).  And, if Mangold acquired

government status, the interrogation in the Wal-Mart conference room was unconstitutional,

according to the defense, because Mangold failed to give Duffy *Miranda* warnings, detained

Duffy without probable cause, and coerced or compelled Duffy to incriminate himself, all in

violation of his rights under the Fourth and Fifth Amendments to the U.S. Constitution.

38)     Although the government disputes every element of the defense's argument, the

pivotal issue for review is the agency claim.[86]  "The Fourth Amendment proscribes only

governmental action and does not apply to a search or seizure, even an unreasonable one,

conducted by a private individual not acting as an agent of the government."  *United States v.

Lambert*, 771 F.2d 83, 89 (6th Cir. 1985); *see also Arizona v. Fulminante*, 499 U.S. 279, 288 n.4

(1991) (agency status in eliciting a confession).  The constitutional claims stated in support of

the defendant's motion to suppress rest on the singular, necessary premise that Mangold was

acting not only as security manager for Wal-Mart but also as an agent of the police.

39)     Whether Mangold acted as a government agent depends, in significant part, on his

motivation and intent.  The Court of Appeals for the Sixth Circuit has stated that Fourth

---

[86]Motion to Suppress (dkt no. 45) at 4.

Amendment protection under an agency theory arises if the police "have instigated, encouraged, or participated in the search," and the individual "engaged in the search with the intent of assisting the police in their investigative efforts." *United States v. Robinson*, 390 F.3d 853, 872 (6th Cir. 2005), quoting *United States v. Lambert*, 771 F.2d 83, 89 (6th Cir. 1985). In *Robinson*, the Sixth Circuit concluded that no agency relationship arose when a federal drug enforcement officer notified a United Parcel Service security representative that a drug-sniffing dog had alerted to an overnight UPS package. The UPS employee opened the package and found marijuana. *Robinson*, 390 F.3d at 860. The Sixth Circuit reasoned the UPS employee should not be viewed as a government agent because his testimony established a private search – "that he opened the package pursuant to UPS policy, and that [the federal officer] neither asked nor otherwise encouraged him to open it." *Id.,* at 872.

40)     In contrast, the Sixth Circuit found an agency relationship in *United States v. Hardin*, 539 F.3d 404, 407 (6th Cir 2009). In this *en banc* decision, the Sixth Circuit held that an apartment manager acted as a government agent when he entered an apartment under the guise that he needed to inspect for plumbing leaks – a ruse entirely concocted by police – in search of a tenant's guest who was wanted for parole violations and had been convicted of armed robbery. In this context, the search of a residence, the Sixth Circuit stated an agency relationship arises unless "the intent of the private party conducting the search is entirely independent of the government's intent to collect evidence for use in a criminal prosecution," *United States v. Howard*, 752 F.2d 220 (6th Cir. 1985). *Hardin*, 539 F.3d at 418. The Sixth Circuit rejected the trial court's finding that an independent business motive supported the manager's entry. *Id.*, at 419. The landlord had no other motive because he had no duty or reason to enter the apartment,

i.e., there was no emergency, no actual or suspected plumbing leak.  *Id.*  On these facts, the Sixth

Circuit held the apartment manager was a government agent.  *Id.*, at 420.

41)  The Sixth Circuit distinguished the *Hardin* case from its holding in *United States v.*

*Howard*, where an insurance investigator gathered evidence of arson and insurance fraud.  *Id.*, at

418-19.  The insurer's potential liability motivated its investigator's actions, *Hardin*, 539 F.3d at

419, and although clearly there was cooperation with the police, the insurance investigator's

private motivation and intent were not attributable to the government.  *Howard*, 752 F.2d at 227-

28.

42)  The defense contends the cooperative relationship between Wal-Mart employees and

the police satisfies this circuit's agency test:  the police influenced the actions of Wal-Mart

employees and culminated in Mangold's desire, in particular, to assist the police investigation by

eliciting a confession and other evidence.[87]  The defense relies particularly on the coincidence of

Mangold's conduct in the conference room, (i.e., taking the camera, wallet, and license), and the

BOLO's advice to take possession of the suspect's cell phone, which according to the defense,

served a police rather than a Wal-Mart investigation.

43)  The magistrate judge respectfully disagrees with the defense's characterization of the

facts.  At no point prior to or during the conference room interrogation, in the magistrate's

judge's view, did Duffy's presence transform from consent to coerced detention.  Duffy

voluntarily followed Mangold to the conference room, no doubt seeking to avoid an angry and

potentially aggressive group of shoppers.  Mangold's touch to Duffy's arm was persuasive, not

coercive.  Duffy made no attempt to leave the conference room and no attempt to evade

---

[87]Again, the defense argues the police alter ego stepped in when Mangold led Duffy to the conference
room.  The defense does not contend an agency relationship existed before such time.

questioning. The magistrate judge specifically credits Dorsey's and Mangold's testimony that Duffy willingly cooperated.[88] Further, Mangold testified convincingly that he asked for the cell phone in particular because most are equipped with cameras and access would allow Duffy to destroy potential evidence – a valid point in hindsight, knowing of Duffy's action in flushing the memory card.

44)      Whether the defense argument that on May 2nd, Mangold's conduct served a police investigation rather than the interests of Wal-Mart is, in the magistrate judge's view, the pivotal issue. The government argues this case is more analogous to *Howard,* where the insurance investigator, who acted independently of, yet cooperatively with, the police. No agency relationship arises if the person's intent is "entirely independent" or, the government argues, if the person would have acted the same way regardless of police involvement. The magistrate judge agrees. Like the insurance investigator whose conduct served his employer's interests, Mangold would have conducted a conference room interrogation in the same manner regardless of police involvement.

45)      Wal-Mart had its own investigative procedures, which it followed. Wal-Mart also had its own highly developed internal security department, which was focused on promoting Wal-Mart's own business interests. Wal-Mart did not want the public relations problems of having consumers believe that Wal-Mart was providing a venue for a pedophile to video young boys in the restroom. Wal-Mart had a strong interest in assuring the safety of its customers and in avoiding unfavorable publicity as a stalking ground for pedophiles. The magistrate judge concludes that Wal-Mart acted independently and was not the alter ego of law enforcement.

---

[88]*See supra* ¶¶ 24, 25, 28.

46)     If the defendant's agency theory is to be believed, the magistrate judge would have to discredit entirely the testimony of Dorsey, a particularly compelling witness.  Her testimony clearly refuted the defense theory that Mangold was motivated by police involvement and the BOLO specifically.  Dorsey is an employee, who lacks a secondary education but who advanced herself through the ranks of Wal-Mart to hold a position of significant responsibility.  As a testifying witness, her manner was not guarded, she was appropriately nervous (speaking over her examiner, for example), and lacked the sophistication of a witness who might be reluctant to support the defense's emphasis on police coordination.  She testified explicitly that Mangold acted in a way "we normally do."[89]  The magistrate judge found her demeanor to be genuine.  Her testimony on this and other points remained unimpeached.

47)     The magistrate judge concludes no credible evidence supports a finding that Wal-Mart acted as an agent of the police, as required by Sixth Circuit precedent.  Because Duffy incriminated himself during a private interrogation, no *Miranda* warning was required, no Fourth or Fifth Amendment violation occurred, and probable cause supported his arrest.

### III.  RECOMMENDATION

Therefore, the magistrate judge recommends that the court deny the motion to suppress.

DATE:   February 1, 2010

                                    *James D. Moyer*

                              **James D. Moyer**
                     **United States Magistrate Judge**

---

[89]*See supra* ¶ 32.